UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| Gillian Suess | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | No. 16 CV 50260 |
|  | ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting | ) |  |
| Commissioner of Social Security,[1] | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## MEMORANDUM OPINION AND ORDER

This long-running disability benefits case returns to this Court for a second time. Plaintiff Gillian Suess worked for Honeywell for almost 25 years until she was laid off in April 2002. Over the next several years, she negotiated for and then received severance payments, applied for and received unemployment benefits for seven or eight months, and ran a home business selling watches on eBay. Then, in May 2005, she filed for disability insurance benefits. She alleged that her disability began in April 2002—*i.e.* the same time she was laid off.

Her primary impairments are panic attacks and fibromyalgia. Her panic attacks, along with related anxiety, have been a life-long problem. These problems began when she was a child and continued through school and also during her 25-year employment with Honeywell. Despite these problems, she was reasonably able to cope. In school, she handed her work in on time and got mostly straight As. R. 558. On the job, she was able to stay fully employed for 25 years. However, she alleges that her problems worsened at the tail end of her stint at Honeywell. The panic attacks gradually worsened. Also, at some point during this general period, she was diagnosed with fibromyalgia. The fibromyalgia and other, possibly-related conditions (including

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

1

headaches, irritable bowel syndrome, and carpal tunnel syndrome) added to the problem. She claims that, since stopping work, these problems have continued to worsen and that she now is mostly home-bound and cannot concentrate fully on any task. R. 77.

This case has a lengthy procedural history, as evidenced by the fact that it is now over twelve years old. To summarize, the first of three administrative hearings was held on July 10, 2007. No medical expert testified. A few weeks later, the administrative law judge ("ALJ") issued a 12-page decision finding plaintiff not disabled. Plaintiff filed an administrative appeal, and the Appeals Council remanded for a new hearing. On March 30, 2009, the same ALJ who presided over the first hearing held a second hearing. Psychologist Ellen Rozenfeld testified as a medical expert. On May 14, 2009, this same ALJ again found plaintiff not disabled. This decision was 16 pages. Plaintiff then filed an appeal to this Court. On May 10, 2013, Magistrate Judge Mary Rowland of this Court issued a 32-page decision remanding the case for further administrative proceedings. On March 18, 2015, a third administrative hearing was held. This hearing was before a different ALJ. Two experts testified. Dr. James McKenna addressed the fibromyalgia and other physical conditions, and Dr. Michael Carney testified about the mental impairments. On June 26, 2015, this second ALJ issued a 25-page decision finding plaintiff not disabled.

In this appeal, the parties do not base any of their arguments on the first two ALJ decisions, or on Judge Rowland's decision, and instead focus solely on the third ALJ decision. In this decision, the ALJ concluded that plaintiff's residual functional capacity ("RFC") was such that she could perform her past relevant work as a data entry clerk. Plaintiff performed data entry for most of career at Honeywell until she was switched late in her career to the computer hot line after the data entry job was downsized. R. 33. The ALJ's decision contains many

arguments and rationales, but the overarching theory is that plaintiff's worsening symptoms were caused by the switch to the hotline job that required more interaction with people, thereby exacerbating her anxiety. The data entry job, in contrast, was on the second shift and was quieter with no phone work. R. 40. In further support of this theory, the ALJ noted that plaintiff's condition improved, or at least stabilized, after she stopped working full-time. Another rationale was lack of consistent treatment. The ALJ observed that, over a seven-year period, there were only "three periods of counseling, each less than six months." R. 592. The ALJ also placed weight on various activities plaintiff engaged in that were allegedly inconsistent with plaintiff's portrayal of herself as home-bound. Finally, the ALJ gave little weight to several opinions from treating physicians.

In evaluating the ALJ's decision, this Court asks whether it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). This Court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). If there is conflicting evidence about which reasonable minds could differ, this Court "must" defer to the ALJ's interpretation so as long as it one of those reasonable interpretations. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

The latter principle is particularly relevant here. In her two briefs, plaintiff has raised numerous arguments attacking some (but not all) aspects of the ALJ's decision. In general, these arguments advance reasonable—some might even say persuasive—arguments about how to interpret disputed evidence. But as the Seventh Circuit has made clear, if the ALJ relies on

contrary but reasonable inferences based on this same evidence, this Court may not second-guess that decision.

Plaintiff's numerous arguments for remand are not arranged under clearly demarcated headings. This Court finds that they can be grouped initially into two broader categories for purposes of discussion. First, the ALJ allegedly placed too much weight on plaintiff's activities and did so by relying on layperson intuitions. Second, the ALJ allegedly failed to give sufficient weight to the opinions of several doctors. After discussing these two lines of argument, the Court will discuss any remaining arguments.

**I.  Plaintiff's Activities.**

Plaintiff raises several arguments directed at the ALJ's reliance on plaintiff's various activities. These activities include not only the traditional day-to-day activities, hobbies, and chores considered in most disability cases (here, for example, that plaintiff gardened, did yoga on occasion, walked to the post office, did photography, worked on the computer, did crafts and sewing, occasionally went to the store with her husband) but also other one-off activities (the primary one being plaintiff's role in closing her mother's and stepfather's estates).

Plaintiff's first argument focuses on the Step Three analysis—specifically, the four Paragraph B criteria in the Section 12 mental health listings analysis. To qualify as disabled under one of these listings, such as 12.06 for anxiety, plaintiff needed to have "marked" limitations in two of the first three categories. The ALJ found that plaintiff had mild limitations in activities of daily living ("ADL"); moderate limitations in social functioning; and mild limitations in concentration, persistence or pace (hereinafter, "concentration"). Plaintiff complains about these findings, arguing that the ALJ "summarized much anecdotal evidence and

failed to discuss significant medical evidence" and also reached these conclusions "without the guidance of a psychiatrist or psychologist." Dkt. #10 at 7.

As for the latter assertion—that no medical opinions supported the ALJ's Paragraph B conclusions—this argument overlooks the opinion of psychologist Kirk Boyenga, a State Agency consultant, who indicated on one form that plaintiff had mild restrictions in ADLs; mild restrictions in social functioning; and moderate limitations in concentration. R. 378. These findings matched the ALJ's findings except for one difference. Dr. Boyenga flipped the moderate/mild findings, finding that plaintiff had only mild difficulties in social functioning (one step less severe than the ALJ) but had moderate difficulties in concentration (one step more severe than the ALJ). In short, there was a close match. In any event, Dr. Boyenga did not find that plaintiff had marked limitations in *either* of these categories, much less both. Moreover, on a second form, which breaks down the Paragraph B criteria into sub-categories, Dr. Boyenga found that plaintiff was "not significantly limited" (the lowest category) in five out of eight of categories for concentration; whereas, only three out of eight were checked as "moderately limited." R. 382. On this same form, Dr. Boyenga provided the following narrative that supports not only the ALJ's Paragraph B findings, but also her later RFC formulation:

> Claimant experiences an anxiety disorder and a pain disorder. There is documentation of outpatient treatment by a family doctor, but no indication of psychiatric care. The CE physician reports that claimant has been under-treated, yet is unaware that claimant has refused treatment opportunities in the past that could contribute to significant improvement. Claimant was noted by treatment sources to be more focused on [her] disability application than on pursuing a plan of treatment. The only functional limitations documented by available source[s] occur when claimant has a panic attack. She reports on examination that medication helps alleviate the symptoms. Claimant is fully oriented and free of thought disorder or serious memory problem[s]. She can do chores within physical limitations and does computer sales from her home. Claimant is capable of performing simple and detailed tasks. Social skills are impaired, but allow settings with reduced interpersonal contact. Claimant relates well with family. Adaptation abilities are

5

> limited, but allow routine, repetitive tasks. Claimant can follow instructions. Travel is reported to be limited, but claimant is able to go to familiar locations.

R. 384. Although the ALJ did not quote this passage, the ALJ referred to the Boyenga evidence.

Plaintiff's next argument is that the ALJ essentially cherry-picked the evidence about her activities. This is an argument often made by claimants who point out qualifications and counter-evidence supposedly overlooked by an ALJ. This is certainly a valid line of argument. The Seventh Circuit has repeatedly cautioned that, unlike with work activities, a claimant often can perform household activities under a more flexible standard and then these activities are typically judged by a lower standard of performance. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *Hamilton v. Colvin*, 525 Fed. Appx. 433, 438 (7th Cir. 2013) ("We have admonished ALJs to appreciate that, unlike full-time work, the 'activities of daily living' can be flexibly scheduled"). However, this does not mean that such activities are entirely irrelevant. It is true that it will rarely be possible to draw a straight line from a single discrete activity—such as gardening—to the bottom-line conclusion that a claimant was not disabled. But this does not mean that these activities, when considered as part of a larger mosaic of different types of evidence, have no relevance. It is a matter of proportionality. Here, after reviewing the ALJ's decision in its totality, this Court finds that the ALJ did not commit an error requiring a remand.

Plaintiff focuses on certain activities and complains that they were merely "modest" and not inconsistent with her claim of rarely leaving the home. Plaintiff also raises factual qualifications, such as the fact that she felt pain and fatigue the next day after gardening. All these points may be true, but they do not establish that the ALJ was relying on an unfairly one-sided view of the evidence. For example, the fact that plaintiff was sore after gardening does not change the fact that she felt able enough to engage in the activity in the first place and that she got out of the house to do so; in addition, the ultimate issue in this case is whether plaintiff could

work a sedentary job such as a data entry clerk, one arguably involving less physical exertion than gardening. This Court agrees that these particular day-to-day activities would not be enough evidence by themselves, but there is no suggestion that they ALJ believed they were determinative on their own.

It is also important to note that the ALJ also relied on other, non-typical activities to bolster these facts. These included vacationing at a family cabin, working out of her home after the onset date, composing a "detailed business letter" to Honeywell in August 2002, and, most significantly, managing her mother's and stepfather's medical problems and then their legal estates after they passed away in short succession in the fall of 2007. R. 601.

Plaintiff does not comment on the business letter.[2] As for the vacation, plaintiff argues that going to the cabin was not relevant because it is not clear what activities plaintiff did there or whether they were "strenuous." Dkt. #10 at 19. Here again, context and weight are important. One of the issues is whether plaintiff could leave the home. In this one instance, she did so. It is true that she later told her doctor that she had some anxiety with the "noisy" people there, but the fact that she was willing to venture out among people is itself a factor that could be deemed relevant. As for the home business, the ALJ stated the following: "Even if not [substantial gainful activity], this work activity implies that her daily activities have been at times, greater than she alleged during the period under adjudication." R. 588. Again, the ALJ did not place great weight on this one fact. Plaintiff argues that the ALJ failed to establish how often plaintiff did this work and how much effort was required. However, the ALJ noted that plaintiff earned $1,375 in 2003 and $971 in 2004. This implies some degree of organization and follow-through.

---

[2] This Court has reviewed the letter, which is technically an email. *See* R. 487-88. It is fair to say that it is detailed, just as the ALJ concluded. It is lengthy, well written, and documents plaintiff's persistent and organized efforts to get disability benefits from her employer. The letter describes multiple rounds of phone calls and emails. There is a clear sense that plaintiff was able to track and follow up on previous requests in a timely and assertive way. This evidence could be seen as relevant to plaintiff's ability to concentrate on detailed tasks.

7

Plaintiff has claimed that she could not even concentrate long enough to read a short article or follow the plotline of a television show.

Perhaps the key piece of evidence, at least in terms of activities, was plaintiff's role in taking care of her mother and stepfather, which included multiple visits to a hospital out of town and then involved a myriad of activities in handling their legal estates. This effort took place over a period of months, perhaps even longer than a year. Much of the evidence about these activities comes from the notes of Dr. Zehra Rowjee, a board-certified psychiatrist at the FHN Family Resource Counseling Center. Plaintiff saw Dr. Rowjee multiple times during this period for medication management.[3] The ALJ mentioned this evidence repeatedly throughout the opinion. *See* R. 595, 599, 600, 601. It is worth quoting Dr. Rowjee's observations in some detail. Dr. Rowjee made the following comments:

- Plaintiff "has to handle all the legal paperwork and the insurance issues [for her mother's estate]." R. 411.
- "*In spite of* her agoraphobia [and] having panic attacks, the patient has to go up to the UW Madison Hospital." R. 420 (emphasis added).
- "The patient does get anxiety attacks from time to time, but she has been *fighting her phobias* and going into the hospital to take care of her mother on *a daily basis*." R. 422 (emphasis added).
- "The patient seems very despondent, down and overwhelmed *because both of the deaths were unexpected*. She is left with a lot of paperwork and dealing with the estate of her mother and stepdad." R. 415 (emphasis added).
- "She is having panic attacks and agoraphobic symptoms *when she does not take the medication*." R. 415 (emphasis added).
- "The patient is very involved in helping her mother [*i.e.* after plaintiff's stepfather's recent death] with all the legalities and driving her around, and this has made it difficult for her with her depression and panic attacks with agoraphobia. Although she is doing everything, and maybe this is a blessing in disguise because she is going into crowded places and waiting in the waiting rooms, like the mother's lawyer's office and changing the title to her mother's car, etc." R. 424.
- "Soon after [the stepfather] came here he was diagnosed with leukemia. Her stepfather died about two days ago. The patient is handling this fairly well, and in spite of being agoraphobic and having severe panic attacks, she has been making the arrangements. She

---

[3] She also began seeing Dr. Reilly and therapist Leon Freeburg sometime during this general period.

was the one who was taking him for medical appointments, and she stated that Cymbalta is helping her because the fibromyalgia pain is not as bad." R. 425.

Dr. Reilly's notes also refer to these activities. For example, on November 11, 2009, he wrote the following about plaintiff:

> Her mother's estate is getting closer to being settled and this is a relief to her. She has been quite busy trying to get her mother's home sold, which has necessitated various meetings and having to work with an attorney which she does not seem to enjoy. She has only had 1 full blown panic attack in the last 2 months. She has mild panic spells averaging about once a week sometimes, twice, with limited symptoms such as sweating and tremor. Another stress is finances. She is getting no regular paycheck and still has not been approved for disability.

R. 826. This and other statements suggest that plaintiff was "dealing with" multiple issues and doing some of the things that she found most anxiety-inducing, including meeting strangers, waiting in crowded lines, and driving. The ALJ could reasonably compare this evidence to plaintiff's claim that she could rarely leave the house, interact with others, or concentrate on a detailed task.

This evidence also relates to medical opinion evidence discussed in Section II below. Plaintiff's doctors did not merely record that plaintiff did these activities, but they commented on the meaning of these efforts. Dr. Rowjee noted that plaintiff did these activities "in spite of" of the panic and even noted that they were a "blessing in disguise" presumably because they forced plaintiff to engage in activities outside the home. This comment echoes advice that her doctors consistently gave—namely, that she should attempt, with the help of a therapist, to confront her fears through exposure, rather than staying home-bound.[4] Dr. Reilly, for example, advised plaintiff about "cognitive behavioral therapy and the need for exposure to anxiety provoking

---

[4] *See generally* Mayo Clinic Website ("Psychotherapy, also called talk therapy, is considered an effective first choice treatment for panic attacks and panic disorder. Psychotherapy can help you understand panic attacks and panic disorder and learn how to cope with them. A form of psychotherapy called cognitive behavioral therapy can help you learn through your own experience that panic symptoms are not dangerous. During therapy sessions, your therapist will help you gradually re-create the symptoms of a panic attack in a safe, repetitive manner. Once the physical sensations of panic no longer feel threatening, the attacks begin to resolve. Successful treatment can also help you overcome fears of situations that you've been avoiding because of panic attacks.").

9

situations." R. 847; *see also* 842 ("I am recommending cognitive behavioral psychotherapy. [] We discussed potential dependency that could occur on Xanax."). Dr. Carney, who testified at the third hearing as the medical expert, similarly suggested that plaintiff should "try to [wean] the Xanax off." R. 670. He was surprised at how long plaintiff had been on Xanax. Dr. Hoffman, a consulting doctor, echoed this point, writing as follows: "The anxiety disorder is inadequately treated. She has not been given a longer acting Benzodiazepine (e.g. Clonazepam, Lorazepam) and not engaged in serious Cognitive Behavioral Therapy to deal with Agoraphobia." R. 366.[5]

The Court recognizes that plaintiff has an alternative interpretation of this same evidence. Her view is essentially that she engaged in heroic efforts to deal with this unusual and difficult time. At the second hearing, these competing interpretations were discussed in the following exchange:

> **Plaintiff:** And I would just like to say that I—when something serious like that happens, I tend to go into what a friend has called survival mode. I do what I have to. I was so concerned about my mother. After she passed away there was literally about a two-month period where I—I call it crashing. I did not leave the house. I did not take care of anything. I just couldn't function.
>
> **ALJ:** Uh-hum, and that's understandable. But I mean I guess my point being is like if you could force yourself to do this when your mother was ill—I mean if you had to go to work, why couldn't you do the same thing for that?
>
> **Plaintiff:** It would catch up to me eventually. It all depends on the situation, how stressful the situation is.

R. 68. In many ways, this exchange crystallizes the core question in this case. The ALJ concluded basically that plaintiff could eventually get back to work at a job similar to the quiet data entry job she capably performed for almost 25 years. Plaintiff is doubtful she could do so,

---

[5] At the first hearing, on July 10, 2007, the first ALJ focused on this issue as well, asking plaintiff why she did not seek counseling at free clinics and noting that panic disorder was "a lot of times" a "treatable" condition. R. 36-37. Plaintiff answered that she tried a number of medications and explained as follows why she didn't seek counseling: "Lack of money, I guess. I didn't realize there were stated funded programs out there." R. 37. She had been taking Xanax continually for many years and explained that her doctor would write a prescription "that either lasts [her] for a year, and then [she does] the online refills through Walgreens." R. 38.

10

although she still seems, at least in this particular answer, to leave open the possibility that she could work (*i.e.* depends on "how stressful the situation is"). This leads to the second argument below, which considers how the medical experts assessed this general question.

II.     **Medical Opinions**

The record includes opinions or observations from a number of treating, consulting, and testifying doctors and medical providers. At a general level, plaintiff complains that the ALJ "played doctor" and relied on layperson intuitions. The impression given is that most doctors supported plaintiff's theory while none supported the ALJ's theory. In addition, plaintiff specifically complains about the ALJ's rejection of the opinions from Dr. Reilly (a psychiatrist who saw her off and on again from 2009 to 2015) and Dr. Dansdill (a rheumatologist who treated her in 2002 and then again in 2005). It is true that the ALJ gave only "some" or "limited" weight to several doctor opinions. But a closer examination of the record shows that many of medical opinions supported the ALJ's rationale or were inconclusive.

As an initial point, the Court notes that the ALJ discussed the medical opinions at length, devoting over four pages to them. *See* R. 603-08. Thus, this is not a case where the ALJ ignored them or took them lightly. Contrary to plaintiff's suggestions, several of the medical opinions supported the ALJ's decision. As noted above, Dr. Boyenga's two reports provide evidence supporting the ALJ's theory. In particular, Dr. Boyenga concluded that plaintiff could "carry out detailed instructions," which was included in the RFC formulation. R. 382, 593. Plaintiff erroneously has suggested that the ALJ reached this conclusion without any supporting medical opinion. There is also a report from Dr. Hoffman, another State agency consultant, who opined, among other things, that plaintiff could concentrate based on an in-office test. R. 366.

Several of the medical opinions were ambiguous. Dr. Schleich, plaintiff's treating primary care doctor who saw her three times in 2005, completed a form in which he stated merely that plaintiff has panic attacks "*at times* that affect her daily life" and that plaintiff would be "able to do daily activities unless she gets panic attack[s]." R. 341 (emphasis added). In answer to the question whether plaintiff could do "work-related activities such as understand, carry out and remember instructions" and "respond appropriately to supervision, co-workers, and customary work pressures," Dr. Schleich wrote the following: "Patient would be able to do these things but *may* have panic attacks." R. 344 (emphasis added). Although the latter statement contains a slight uncertainty about whether panic attacks could prevent plaintiff from working, Dr. Schleich's statements on the whole seem to suggest that he believed plaintiff could work— or, at least, this is one possible and reasonable interpretation of this opinion. And it is one the ALJ adopted. R. 606.

As for Dr. Carney who testified at the third hearing, the ALJ gave his opinion "little weight." R. 603. In one sense, the ALJ's conclusion could be viewed as a rejection of Dr. Carney's opinion, but this overlooks the fact that Dr. Carney basically punted on the issue, stating that the question was "tricky" because there were not a lot of records. R. 673. Thus, the ALJ reasonably concluded that Dr. Carney's opinion was inconclusive.

There is also Dr. Rowjee's many comments, as set forth above, that support the ALJ's decision. However, interestingly, plaintiff complains that the ALJ "did not explain how she factored in Dr. Rowjee's treatment." Dkt. #14 at 5-6. This argument ignores the ALJ's many references to this evidence. Plaintiff appears to be relying on selective *other* observations from these same notes that show she had an uptick in anxiety during the stressful period of her mother's and stepfather's deaths. *See, e.g.,* R. 420, 422, 423. This fact is true, but as explained

above, the ALJ concluded that the increase was situational and that, even then, plaintiff was able to do many tasks that would likely be more demanding than those on a relatively quiet data entry job.

Plaintiff complains also about the ALJ's rejection of two opinions from Dr. Reilly. *See* Exs. 24F and 28F. On September 28, 2009, Dr. Reilly opined that plaintiff would have difficulty working at a job because of anxiety (he stated that fibromyalgia might add to her difficulties but that he had not diagnosed and was not an expert on this condition). R. 565. On April 1, 2015, Dr. Reilly opined that plaintiff had "[s]ome improvement with current medications," that she had "ongoing panic 2-3 x/week," that she was "[h]ighly anxious being in public," and that she would "likely" panic with "sufficient stress, as would be expected in various work situations." R. 868, 871. As for the paragraph B criteria, he ranked her daily activities as "None-Mild" and both her social functioning and concentration as "Marked." R. 873. Dr. Reilly also found that plaintiff had three episodes of decompensation, each lasting two weeks, all within a 12 month period. *Id.*

The ALJ set forth multiple grounds for giving these opinions little weight. These included the fact that the opinions were inconsistent with each other (for example, on the issue of following simple instructions and interacting with the public). The ALJ noted that Dr. Reilly's treatment records were inconsistent with his opinions. R. 604. The ALJ noted that "Dr. Reilly generally described the claimant as alert, pleasant, friendly, and well groomed" and that these and other observations were not consistent with *marked* limitations. R. 605. The ALJ also found it significant that he believed plaintiff had three episodes of decompensation when there were *no records* suggesting plaintiff had *any* such episode. (And this Court has not seen any evidence in the record even arguably suggesting as much.) For many of the reasons stated above, the Court cannot find that these arguments were improper. Dr. Reilly's office notes portray plaintiff's

13

condition as worse than did Dr. Rowjee and others, but they still are consistent with the ALJ's general theory that plaintiff could—with help of talk therapy and the use of medication— work again as a data entry clerk just as she had done for most of her working life.

Turning to Dr. Dansdill, he was a rheumatologist who completed a questionnaire about plaintiff's fibromyalgia, on June 10, 2005. Ex. 6F. He opined (among other things) that plaintiff could sit for only four hours on a job, that pain would be "frequently" interrupt her concentration, and that plaintiff was "severely limited by panic attack[s] & agoraphobia." R. 333. The ALJ gave this opinion "some weight" for several reasons. The ALJ noted that the opinion was based on a limited treatment history (Dr. Dansdill saw plaintiff "three times in 2002 and then not again for two years"). R. 605. He observed that, although Dr. Dansdill was a specialist regarding fibromyalgia, he was not one for panic attacks, which was a criticism raised by Dr. Rozenfeld, the impartial expert at the second hearing. The ALJ also found the opinion inconsistent with his treatment notes where he had expressed doubts about plaintiff's claims. Specifically, in his office notes from the *same date*, Dr. Dansdill wrote the following: "The fibromyalgia by itself I do not think will qualify for disability and I told her and her husband that. With these other conditions, especially the panic attacks which prevent her from participating in family events or even getting out of the house very well could prevent her from being gainfully employed and I asked her to be seen at the local Adams Center where she has been seen in the past by a psychiatrist or psychologist to further document her disability." R. 309. This statement was noted by the ALJ. R. 597.[6]

---

[6] The ALJ also gave the opinion of therapist Leon Freeburg little weight. The same general arguments regarding Dr. Reilly and Dr. Dansdill apply to the ALJ's analysis of this opinion.

In sum, the Court finds that the ALJ had to analyze and reconcile many, often inconclusive, medical opinions and that the ALJ did so by considering all the relevant opinions and then providing multiple rationales for the weight given to each of them.

## III. Additional Arguments.

The Court finally will address several other stand-alone arguments not covered above.

**Need for Bathroom Breaks.** One discrete argument that plaintiff raised in her opening brief, and also continued to push vigorously in her reply brief, is that the ALJ failed to fully account for her need to use the bathroom often. But the ALJ included a limitation for this issue in the RFC formulation—specifically, that plaintiff "would need to take very brief bathroom breaks of less than five minutes each up to four times during the workday." R. 593. Plaintiff believes that this was not broad enough. She asserts that, "[a]s a result of irritable bowel syndrome, she sometimes needed to use the bathroom five-to-seven times over the course of a few hours." Dkt. #10 at 5. The evidence supporting this claim is her testimony from the third hearing. Plaintiff argues that the ALJ failed to provide medical evidence to support the limitation she chose.

The Court is not persuaded that this issue requires a remand. The ALJ did not ignore the issue but addressed it and provided a rationale. The ALJ found that plaintiff's complaints about needing frequent bathroom breaks were not corroborated in the subjective reports plaintiff made to her medical providers. R. 595; *see also* R. 601 (noting that the need for bathroom breaks was "not reported to medical providers consistently, which was noted by the medical expert at the hearing"). The Court finds that this rationale is sufficient, especially given that the ALJ included some limitation to partially account for plaintiff's claims. Moreover, the Court notes that plaintiff's testimony does not fully support the broader suggestions made in her briefs. At the hearing, plaintiff was specifically asked about the effect of her irritable bowel syndrome *on a*

15

*bad day*, and she responded that it might need "five, six [unscheduled] bathroom breaks before it finally settled down." R. 655. She stated that these would all take place in a short amount of time, about a couple of hours. *Id.* She was then asked about the frequency of such episodes, and answered that they happen "several times a month," an answer that she later qualified slightly as "[m]aybe three to five times a month." R. 656. This suggests that the problem was more sporadic than a regular everyday occurrence. Given that some of the three-to-five times could occur on a weekend or evening, it is not clear that these two-hour stretches would preclude her from working. For these reasons, the Court does not find that a remand is required on this issue.

**Objective Findings and Fibromyalgia.** Plaintiff complains generally that the ALJ played doctor in concluding that plaintiff had normal objective medical findings and that the ALJ specifically erred in assuming there should be confirmatory objective findings for fibromyalgia, which is a condition that does not have a simple objective test to diagnose and relies heavily on subjective statements. The Court does not find that the ALJ committed any error warranting a remand. As for the objective findings, some of the ALJ's comments were not directed at fibromyalgia but at more specific symptoms or ailments such as dizziness, carpal tunnel syndrome, and headaches, and some of the references were to tests performed by doctors to diagnose these conditions. As for fibromyalgia, the ALJ discussed this issue under the correct framework of SSR 12-2p. The ALJ also summarized the evidence from Dr. Dansdill, the rheumatologist who diagnosed this condition. The ALJ noted that Dr. Dansdill pointed to certain objective tests in discussing her fibromyalgia and on several occasions specifically noted that this particular condition had "improved." *See* R. 597, 311, 318.

**No Psychiatric Hospitalizations or Incarcerations.** Plaintiff complains that the lack of hospitalization does not mean that a claimant does not have serious mental health problems. Plaintiff cites to Seventh Circuit cases making this general point. *See, e.g., Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015). But this is another instance where it is important to put the ALJ's statements in context. The lack of hospitalizations and incarcerations was not mentioned as important part of the analysis. Instead, it was offered as part of the discussion on whether plaintiff had any episodes of decompensation and also why the ALJ did not find that plaintiff's social limitations were *more* than moderate. The Court does not find that these brief references were improper, especially when used for these limited purposes.

\*   \*   \*

In sum, the Court finds that the ALJ relied on substantial evidence, discussed the relevant lines of evidence, acknowledged counter-evidence when appropriate, and explained the general path of her reasoning. Still, this Court recognizes that this is a close case. Plaintiff has raised numerous reasonable arguments about how the evidence should be interpreted, but the Court finds that in general they boil down to requests for this Court to "reweigh [the] evidence" and then "substitute [its] judgement for the ALJ's." *Alvarado v. Colvin*, 836 F. 3d 744, 747 (7th Cir. 2016). This is not a role this Court is permitted to play.

As a final observation, a question that inevitably hovers over this decade-long case is whether a fourth administrative hearing and decision would yield any clearer picture than did the first three attempts. Each time, the ALJ's decision has grown in length, and each hearing has been longer with more experts being called each round. Two different ALJs have reviewed the case. Yet, throughout this lengthy process, it does not appear to this Court that the basic evidentiary picture or the basic legal arguments have changed much.

For all the above reasons, plaintiff's motion for summary judgment is denied, the Government's motion is granted, and the ALJ's decision is affirmed.

Date:  September 20, 2017          By: _____
                                       Iain D. Johnston
                                       United States Magistrate Judge